**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 92-7501
_____

THE LAUDERDALE COUNTY SCHOOL DISTRICT,
By and Through Its Board of Education,
JOHN L. KNIGHT, WANDA McPHAIL, and
ARNOLD M. TREAT,

                              Plaintiffs-Appellees
                              Cross-Appellants,

VERSUS

ENTERPRISE CONSOLIDATED SCHOOL DISTRICT,
by and Through Its Board of Education,

                              Defendant-Appellant
                              Cross-Appellee.

*         *         *         *         *         *
*


QUITMAN CONSOLIDATED SCHOOL DISTRICT,

                              Plaintiff-Appellant
                              Cross-Appellee,


VERSUS

ENTERPRISE CONSOLIDATED SCHOOL DISTRICT,

                              Defendant-Appellee
                              Cross-Appellant.


_____

Appeals from the United States District Court
for the Southern District of Mississippi
_____
(June 16, 1994)

Before WOOD,[1] SMITH, DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This is a consolidated case involving three Mississippi school districts: the Lauderdale County School District ("Lauderdale"), the Enterprise School District ("Enterprise"), and the Quitman School District ("Quitman"). The magistrate judge ordered the transfer of certain students from Enterprise to Lauderdale and from Quitman to Enterprise. We reverse these transfers, but we affirm the other portions of the judgment, regarding interdistrict payments and the annexation of the Stonewall area by Quitman.

I.  Facts.

In 1953, the Mississippi legislature passed a law reorganizing the state school system in order to provide separate but equal education for white and black students. 1953 Miss. Laws, Extraordinary Session, ch. 12. All of the school districts in Mississippi were reorganized by July 1, 1957. The three school districts that are parties to this case are Lauderdale, which encompasses all of Lauderdale County except for the City of Meridian; Enterprise, which encompasses the northern third of Clarke County; and Quitman, encompassing the southern two-thirds of Clarke County. Lauderdale County borders Clarke County on the north.

---

[1] Circuit Judge of the Seventh Circuit, sitting by designation.

A.  Clarkdale School:  Pre-desegregation.

Under the 1953 reorganization, Lauderdale County was divided into two school districts, the Meridian Municipal Separate School District, encompassing the City of Meridian and the surrounding area, and Lauderdale, encompassing the remainder of Lauderdale County.  The pre-reorganization Clarkdale Line Consolidated School District, which had included territory in both Lauderdale and Clarke counties, was abolished and its territory placed under control of Lauderdale.  The unincorporated area of Meehan, located in Lauderdale County along the border of Clarke County, was also brought under Lauderdale's control.

The Clarkdale school,[2] a <u>de jure</u> white school during segregation, straddles the border between Lauderdale County and Clarke County.  For a number of years, Enterprise and Lauderdale entered into one-year agreements regarding the ownership and operation of Clarkdale.  On February 13, 1962, Lauderdale and Enterprise entered into a twenty-five-year agreement (the "Clarkdale agreement") providing that white students from northeastern Clarke County would attend the Clarkdale school and that approximately 100 students in the Meehan area in Lauderdale would attend the all-white Enterprise school in the western part of the Enterprise district.[3]

---

[2] The parties sometimes refer to a school as an "attendance center," e.g., "the Clarkdale Attendance Center."

[3] The Clarkdale agreement provided, among other things, that Lauderdale would operate the Clarkdale school; that Enterprise would take over the operation of the school if Enterprise acquired a 51% or greater ownership of the property of the school; that before any principals or teachers were hired at Clarkdale, Lauderdale would submit their names to Enterprise 30 days before hiring them;

(continued...)

3

Before desegregation, Lauderdale had one black school, Middleton, which served the entire district. It had four white schools: Northwest (now West), Northeast, Southeast, and Clarkdale.

### B. Stonewall: Pre-desegregation.

Under Mississippi's 1953 reorganization plan, Clarke County was reorganized into two districts: the Clarke County Consolidated School District (later Enterprise) and Quitman. Enterprise comprised the northern part of the county, including an area called "Northeast Clarke County," the town of Enterprise, the town of Stonewall, and the area surrounding Stonewall.[4] Quitman comprised

---

[3](...continued)
that Enterprise could object to the hiring of any principals or teachers at Clarkdale; that if Lauderdale refused to consider any such objections, the matter would be submitted to binding arbitration; that the Clarkdale school would be jointly owned by the Lauderdale County Board of Education and the Board of Trustees of the Clarke County Consolidated School District (later the Enterprise school district); that the proportion of ownership would be based upon the respective amounts of money contributed to the school by citizens in the respective counties, the amount contributed by Lauderdale and the Clarke County Consolidated School District, and the amount of state funds allocated to either county district based upon attendance at Clarkdale; that the Clarkdale school should be a "white attendance center" for grades one through twelve; that all "eligible school children" in Northeast Clarke County would be assigned by the Clarke County Consolidated School District to attend Clarkdale; that all "eligible school children" in the Meehan area of Lauderdale County would attend the Enterprise attendance center in the Clarke County Consolidated School District; that each school district would pay for transportation of its students attending Clarkdale; that "[a]ll state funds of every description, except transportation funds, shall follow the child, and shall accrue to and be paid directly by the state to the district in which the child actually attends school, and for this purpose the Clarkdale Attendance Center shall be considered to be in the Lauderdale County School District so long as it shall operate the same"; that the total cost of the school would be divided between the districts on the basis of the average daily attendance of students; that the contract would be effective upon approval by the necessary parties and would run for a period of 25 years; and that breach of one part of the agreement would not affect the binding effect of the agreement.

[4] Stonewall and the surrounding area are referred to as the "Stonewall area."

4

the southern part of the county, including the town of Quitman.  In addition to the two school districts, there was the Clarke County Board of Education, which had limited supervisory authority over the transportation of Enterprise and Quitman students and the authority to hear transfer appeals.

Enterprise had a white elementary school, a white high school, a black elementary school, and a black high school.[5]  Quitman had two black elementary schools, one black high school, one white high school, one white lower elementary school, one white upper elementary school, and the Stonewall School.

In 1962, Enterprise announced that it would convert the Stonewall school, an all-white school, from grades 1-12 to grades 1-6.  White parents in Stonewall petitioned to have the Stonewall area detached from Enterprise and annexed to Quitman.  The Quitman district passed a resolution to annex the Stonewall area.  The Clarke County Board of Education tabled the Enterprise school district's plan to convert the Stonewall school from grades 1-12 to 1-6 and adopted a resolution detaching the Stonewall territory from Enterprise and annexing it to Quitman.

Enterprise and Quitman approved a twenty-five-year agreement providing that all blacks in Stonewall would attend the all-black school in Enterprise and that all state funds would be paid to the district where the student attended school.  This agreement was part of a larger compromise agreement that settled litigation over

---

[5] Enterprise Elementary School, Enterprise High School, Central Elementary School, and Central High School, respectively.

ownership of Stonewall.

C. Desegregation.

In 1963, the United States brought a desegregation suit against Lauderdale. United States v. Lauderdale Sch. Dist., No. 1367(E) (S.D. Tex.). In the same district court in 1965, private plaintiffs filed a desegregation suit against Quitman, Enterprise, and the Clarke County Board of Education. Killingsworth v. Enterprise Consol. Sch. Dist., No. 1367(E) (S.D. Miss.).

In 1967, the district court in Killingsworth instructed Quitman and Enterprise to file desegregation plans. The court tentatively accepted the "freedom of choice" desegregation plan filed by the school districts but, on July 19, 1967, rejected the "freedom of choice" plans and entered a final order that (1) enjoined Enterprise, Quitman, and the Clarke County Board of Education from discriminating on the basis of race or color, (2) held that Enterprise, Quitman and the Clarke County Board shall take affirmative action "to establish all school segregation and to eliminate the effects of the dual system," (3) allowed all students, irrespective of race or color, to exercise, every year, the choice of which school in their district to attend, (4) held that overcrowding of the particular school chosen will be the only reason for denying the student's choice of which school to attend, and (5) held that there will would be no more interdistrict transfers between Enterprise and Quitman "except on terms and by

6

procedures generally applicable regardless of race." Although asked to do so by plaintiffs in Killingsworth, the court did not find the contract of June 11, 1962, between Enterprise and Quitman unconstitutional.

The district court consolidated Killingsworth, Lauderdale, and other pending desegregation cases. After consolidation, the cases were reported as United States v. Hinds County School Board. On July 3, 1969, in a consolidated appeal that included Lauderdale and Killingsworth, this court reversed and remanded, directing the district courts to request the United States Department of Health, Education, and Welfare ("HEW") to collaborate with the school boards to develop desegregation plans. United States v. Hinds County Sch. Bd., 417 F.2d 852, 856-59 (5th Cir. 1969), cert. denied, 390 U.S. 1032 (1970). If an individual school board and HEW agreed to a desegregation plan by August 11, 1969, the district courts were to implement the plan if it met constitutional standards. Id. at 858. If no such agreement could be reached, the district courts were to implement the HEW plan if it met constitutional standards. Id. at 858-59.

HEW filed its plans for all three districts on August 11, 1969. On August 28, 1969, this court extended, at the government's request, the deadline for filing plans from August 11 to December 1. In effect, this allowed the parties additional time to redraft the plans. On October 29, 1969, the Supreme Court vacated the extension of the deadline, directing this court to issue desegregation orders immediately. Alexander v. Holmes County Bd.

7

of Educ., 396 U.S. 19, 20 (1969) (per curiam). At its discretion, this court could modify and implement the government plans. Id. In response to Alexander, this court ordered that all thirty permanent HEW plans prepared for school districts in the Southern District of Mississippi, including Lauderdale, Enterprise, and Quitman, be implemented immediately. United States v. Hinds County Sch. Bd., 423 F.2d 1264, 1267-68 (5th Cir. 1969), cert. denied, 396 U.S. 1032 (1970).[6]

The August 11, 1969, HEW plan for Lauderdale contained the following majority-to-minority transfer provision:

> Whenever there shall exist schools containing a majority of Negro students, this school district shall permit a student (Negro or white) attending a school in which his race is in the majority to choose to attend another school where space is available, and where his race is in a minority.

Thus, transfers between schools can occur if the student seeking transfer is a minority in the transferee school. The plan also contained a Singleton provision prohibiting the interdistrict transfer of students unless the transfers are done on a

---

[6] This court delayed implementation of a permanent plan for Quitman for one year:

> It appearing that the lack of buildings prevents the immediate implementation of the permanent plan of the Office of Education suggested for the Quitman Consolidated school district, the pupil attendance interim plan of the Office of Education for this district is authorized for use during the remainder of this school term (App. 5). The permanent plan shall be effectuated commencing in September, 1970. This relief is appropriate in view of the similarity between the proposed attendance plan of the school district and that of the Office of Education.

423 F.2d at 1268.

8

nondiscriminatory basis and do not increase segregation.[7]

The rest of the segregation plan, which dealt with attendance patterns, was amended by this court so that Lauderdale would be divided into four separate attendance zones of West Lauderdale, Clarkdale, Southeast, and Northeast.  United States v. Lauderdale County Sch. Dist., No. E88-0059(L) (5th Cir. 1969) (unpublished). All students living in the zones associated with the West Lauderdale, Clarkdale, and Southeast schools would attend the schools in each of the zones.  The students residing in the Northeast zone, which contains both the Middleton school and the Northeast school, would attend the Middleton school if they were in grades 1-6 and the Northeast school if they were in grades 7-12.

In the 1969-70 school year, when the desegregation plans were formulated, Quitman contained 2,929 students, 1,458 (50%) black and 1,471 (50%) white.  The desegregation plan projected that Quitman's student population would total 3,146 students, 1,490 (47%) black and 1,656 (53%) white.  Enterprise's actual enrollment for the 1970-71 school year was 858 students, 339 (40%) black and 519 (60%) white.  Enterprise was projected to contain 768 students, 363 (47%) black and 405 (53%) white, in 1969.  Clarkdale's actual enrollment as of April 15, 1970, was 553 (80%) white and 142 (20%) black,

---

[7] "If the School District grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system."  This provision is named for Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211 (5th Cir. 1969) (en banc), rev'd in part sub nom. Carter v. West Feliciana Sch. Bd., 396 U.S. 290 (1970).

totaling 695.  The HEW plans had projected that Clarkdale's population would be 788 students, 203 (26%) black and 585 (74%) white.  Lauderdale's actual student population, as of April 15, 1970, totaled 4,583, of which 1,716 (37%) were black and 2,867 (63%) were white.  The projected student population for Lauderdale was 5,078 total, of which 1,926 (38%) were black and 3,150 (62%) were white.

The HEW plans for Enterprise, Lauderdale, and Quitman called for immediate desegregation of all schools.  Like the Lauderdale plan, the Enterprise and Quitman plans contained a majority-to-minority transfer provision and a Singleton provision.

D.  Clarkdale School:  Post-desegregation.

After desegregation, the Northeast Clarke County students continued to attend the Clarkdale school.  Pursuant to the Clarkdale agreement, Enterprise paid money to Lauderdale for educating its students.  But two years before the twenty-five-year agreement expired, Enterprise stopped paying Lauderdale.

When the agreement expired, Enterprise refused to allow any more transfers of its students to Lauderdale.  The transfers nonetheless continued to be made under the authority of the Clarke County Board of Education, which overruled Enterprise's denials of requests for transfer.

In the 1991-92 school year, Lauderdale approved the transfer of 50 students from the old Meehan area, consisting of 36 white students, 13 black, and one other.  Similarly, the Clarke County

board approved the transfer of 309 Northeast Clarke County students, 285 white and 24 black, for attendance at the Clarkdale School in the 1991-92 school year. Enterprise had also accepted transfers under an arrangement with Jasper County under which some 83 white students were currently allowed to transfer into Enterprise.

Beginning with the 1991-92 school year, the magistrate judge forbade any transfers from Jasper County to Enterprise and forbade the transfer of Alabama residents to either Jasper County or Enterprise. Effective January 1, 1992, the Clarke County board was eliminated under a state-wide reorganization. In 1991-92, Clarkdale had some 1,052 students on its rolls, 10% black and 90% white.


E. Stonewall: Post-Desegregation.

Beginning with the school year 1968-69, Quitman refused to pay Enterprise for educating students transferred from Stonewall and expressly repudiated the June 11, 1962, agreement in 1977. In that school year, 135 black students from the Stonewall area attended schools in Enterprise.

From 1984-85 to 1990-91, an average of 99 black students per year have transferred to Enterprise. The total number of transfer students has grown steadily over the years, with approximately 331 students transferring to Enterprise for the 1991-92 school year (including 31 students who reside in Quitman but attend Enterprise because their parents or legal guardians are Enterprise instructors

11

or certificated employees).  Quitman had denied each requested transfer but was overruled by the Clarke County Board of Education. On January 1, 1992, the Clarke County board was eliminated, and Quitman's denials of the transfers stood.

In 1991-92, Quitman's student population was 2,609; its black student population increased from 50% in 1969 to 54% in 1991-92. Quitman now has four schools:  a lower elementary school, an upper elementary school, a junior high school, and a senior high school. In 1991-92, Enterprise educated 819 students, 29% black and 71% white.  Of Enterprise's enrollment on September 30, 1991, 47% (396) resided in Enterprise, 37% (300) resided in Stonewall, and 6% resided in Meehan in Lauderdale County.

## II.  District Court Proceedings.

### A.  The Litigation.

Lauderdale filed an action in state court against Enterprise and the Clarke County board, seeking a judgment against Enterprise for failing to pay Lauderdale during the final two years of the Clarkdale agreement and during the years after the agreement expired.  Enterprise removed the case to federal court and filed a counterclaim, arguing that (1) the Clarkdale agreement had been materially breached by Lauderdale, (2) the Clarkdale agreement was unconstitutional, and (3) the transfer of Enterprise students to Clarkdale violated Lauderdale's 1969 desegregation plan. Enterprise also sought an injunction against future transfers of Enterprise students to Clarkdale.

12

Quitman filed suit in federal court against Enterprise and the Clarke County board, seeking injunctive relief to prohibit the transfer of Quitman students to Enterprise. Enterprise filed a counterclaim alleging (1) that the annexation of Stonewall by Enterprise was constitutionally void and (2) that Quitman owed Enterprise for educating the Stonewall students since 1968.

The parties agreed to have the matters tried by the magistrate judge, who consolidated the cases on October 26, 1989. The Concerned Citizens of Stonewall, Clarke County, Mississippi ("Concerned Citizens"), earlier had moved to intervene in the Quitman v. Enterprise case, No. E88-0065(L). On October 2, 1989, the magistrate judge denied Concerned Citizens's motion to intervene but granted it amicus curiae status. On December 15, 1989, Concerned Citizens filed a motion for relief from the order denying intervention and appealed the denial to this court, which dismissed the appeal of the denial of motion to intervene.[8] The magistrate judge denied Concerned Citizens's motion for relief.[9]

Because of numerous inaccuracies regarding transfers and student addresses, the magistrate judge directed all parties to prepare a statistical compilation of all affected students residing in the respective school districts and required accurate address information regarding all transfers. On July 5, 1991, the magistrate judge issued his first opinion, concluding (1) that the

---

[8] February 13, 1990 (Concerned Citizens had failed to file a timely appellate brief.).

[9] March 1, 1990.

13

Stonewall area was legally annexed to Quitman; (2) that students residing in Northeast Clarke County but who attended Clarkdale should be considered transfer students under Mississippi law; and (3) that Enterprise should be maintained as a viable school district.

On June 1, 1992, the magistrate judge issued a second opinion, concluding (1) that 100-125 black students must be allowed to transfer from the Stonewall area to Enterprise in order to preserve the viability of the Enterprise district, to preserve racial balance, and to perpetuate Killingsworth; (2) that Enterprise should recover from Quitman for the years 1987-88 and 1988-89 under MISS. CODE ANN. § 37-19-33, which then required payment of transfer funds between districts in the same county; and (3) that Lauderdale should recover fees from Enterprise for the 1985-86, 1986-87, 1987-88, 1988-89 years, but for no other years.

On July 10, 1992, the magistrate judge issued the final judgment, which adopted by reference the two previous opinions. Under the final judgment, the Stonewall territory was deemed to be part of Quitman. Beginning with the 1992-93 school year, all white students residing in Stonewall would begin attending Quitman schools rather than Enterprise schools. Any white student in Stonewall desiring to attend Enterprise would have to submit a transfer request in accordance with state law. High school sophomores, juniors, and seniors enrolled in Enterprise schools in the 1991-92 school year could continue to remain in Enterprise until they graduated.

14

The magistrate judge ordered that, beginning with the 1992-93 school year, Quitman must transfer between 100 and 125 black Stonewall area students to Enterprise.[10] Quitman would pay Enterprise for the students transferred because of the court judgment (i.e., all white students from Stonewall attending Quitman during the transition years of 1992-93 through 1994-95, and 100 to 125 black students transferred in the years 1992-93 and following years). The magistrate judge ordered Quitman to pay Enterprise $205,596.91 for Stonewall area students who had attended Enterprise schools in the years 1987-88 and 1988-89 ($81,022.00 for 1987-88 and $124,574.91 for 1988-89).

The area of Northeast Clarke County area, as defined in the Clarkdale agreement of February 1962, was deemed to be part of Enterprise. Those students residing in Northeast Clarke County, but attending Clarkdale School, were deemed to be transfer students. The judgment provided for transfers of certain students in Northeast Clarke County to the Clarkdale school. Beginning with the 1992-93 school year, a maximum of 125 whites would be allowed to transfer to Clarkdale. Beginning with the 1992-93 school year, all white students attending Clarkdale during the 1991-92 school year, and all white kindergartners, would attend school in the Enterprise school, with the exception of 10th, 11th, and 12th graders, who could remain at Clarkdale. Any black student who attended Clarkdale could continue to attend Clarkdale if he

---

[10] Quitman and Enterprise had to allow all requests for transfer by black students up to 125. At least 100 black students had to be transferred, even if fewer than 100 requested a transfer.

15

requested a transfer.  Enterprise would pay Lauderdale $302,562.30 for educating Enterprise's students during the 1985-86, 1986-87, 1987-88, and 1988-89 years.

On July 23, 1992, Concerned Citizens made a FED. R. CIV. P. 59(e) motion to alter or amend the judgment.  Quitman filed a notice of appeal on July 27, 1992; Enterprise filed a notice of appeal on August 7, 1992, and an amended notice three days later; Lauderdale filed a notice of cross-appeal on August 20, 1992.

On November 16, 1992, the magistrate judge entered an order on various post-judgment motions, granting a FED. R. CIV. P. 60(b) motion by Lauderdale for relief from the final judgment, denying Concerned Citizens's rule 59(e) motion, granting in part and denied in part Enterprise's motion for modification of injunction pending appeal and regarding assignment and transportation of students, and denying a motion by Lauderdale concerning enforcement and/or clarification of the first opinion and the final judgment. Specifically, the court ordered that, first, the word "maximum" would be replaced by the word "minimum" in the final judgment regarding the number of white Northeast Clarke County students to be transferred by Enterprise to the Clarkdale school.  Second, up to forty students in Meehan in Lauderdale County would be transferred to Enterprise.

Third, Enterprise would be responsible, until further notice, for transporting those students from Northeast Clarke County attending the Clarkdale School.  Fourth, all siblings of children transferred either from Enterprise to Clarkdale or from Stonewall

16

to Enterprise under the magistrate judge's authority would also be allowed to be transferred. Fifth, all students with parents working in the Clarkdale School or the Enterprise schools would be allowed to transfer to the school where their parents are employed.

On November 30, 1992, Quitman filed a rule 59(e) motion to alter or amend the November 16 order. The magistrate judge has not yet disposed of Quitman's rule 59(e) motion. Each party has filed notices of appeal of the November 16 order.

The judgment went into effect at the beginning of the 1992-93 school year. Its transfer provisions were phased in during the school years 1992-93 and 1993-94 and were to be fully applied in the 1994-95 school year.

## B. The Parties' Positions on Appeal.

Lauderdale's position on appeal is that we should affirm the transfer of students to Clarkdale and, furthermore, that Enterprise owes it money for students transferred during the 1989-90 and 1990-91 academic years, not just during the 1985-89 years. Enterprise argues that the magistrate judge erred by ordering transfers from Northeast Clarke County to the Clarkdale school, that it should not be required to pay money to Lauderdale for educating its students, and further, that it should not be required to bus students to Clarkdale. Quitman argues that the magistrate judge erred by transferring 100 to 125 black students from the Stonewall area to Enterprise and that it does not owe any money to Enterprise for previous transfers. Quitman agrees with the magistrate judge's

17

decision to allocate the Stonewall area to the Quitman district.

With respect to the Stonewall area, Enterprise argues that the magistrate judge erred in holding that the annexation to Quitman was valid. In the event that the annexation is affirmed, Enterprise contends that the transfer of black students from Stonewall to Enterprise should be affirmed. Enterprise would even want the transfers increased. Concerned Citizens, as amicus, argues that the Stonewall annexation is invalid and that the Stonewall area should be returned to Enterprise.

### III. Appellate Jurisdiction.

### A. Finality.

The July 10, 1992, judgment is a final judgment and, as such, is reviewable on appeal. Under 28 U.S.C. § 1291, a court of appeals has jurisdiction over final, appealable orders of a district court. 28 U.S.C. § 1291. In order for a judgment to be final, it must dispose of all claims of the parties:

> In the absence of [a Rule 54(b) action], any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FED. R. CIV. P. 54(b).

An examination of the July 10 judgment reveals that it disposed of all claims of all parties. Regarding Quitman v. Enterprise, the magistrate judge adjudicated the validity of the

18

Stonewall annexation, ordered a transfer of 100-125 black students from Stonewall to Enterprise, and resolved all monetary issues between Quitman and Enterprise. Regarding Lauderdale v. Enterprise, the magistrate judge ordered that Northeast Clarke County was part of Enterprise, directed the transfer of students from Northeast Clarke County to Lauderdale, required that those students would be considered transfer students, and resolved all monetary issues between Lauderdale and Quitman.

Although the magistrate judge granted two post-judgment motions on November 16, 1992,[11] the original July 10 judgment covered all the subject matter of the parties' claims. Therefore, the July 10 judgment was final and appealable.

For purposes of finality, we need not consider whether the two cases, Lauderdale v. Enterprise, No. E88-0059(L), and Quitman v. Enterprise, No. E88-0065(L), are one suit or two. The July 10 judgment disposes of all issues in both of the cases. The judgment therefore is final, whether the suits are treated as one case or two.

B. Notices of Appeal.

In determining whether the notices of appeal were proper, we apply the recent amendments to the Federal Rules of Appellate Procedure. Although this appeal was filed before the effective date of the amendments, courts should apply the amendments "to the

---

[11] The two post-judgment motions were Lauderdale's rule 60(b) motion for relief from the final judgment and Enterprise's motion for modification of injunction pending appeal.

19

maximum extent possible" if such application would not "not work injustice." Burt v. Ware, 14 F.3d 256, 259 (5th Cir. 1994).[12]

If the two cases are considered as one, then the operative notices of appeal are as follows: Quitman's July 27, 1992, notice of appeal of Quitman v. Enterprise, Enterprise's August 7, 1992, notice of appeal of both cases, and Lauderdale's August 20, 1992, notice of appeal of Lauderdale v. Enterprise. Quitman's and Enterprise's notices were filed within thirty days of the July 10, 1992, judgment. Lauderdale's notice of cross-appeal was filed thirteen days after Enterprise's notice of appeal. Therefore, Lauderdale's notice of appeal was valid under FED. R. APP. P. 4(a)(3), which provides that

> [i]f one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice of appeal was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period last expires.

If the two cases are considered separately for notice of appeal purposes, the notices were proper in both cases. In Lauderdale v. Enterprise, the parties filed their notices of appeal as follows: Enterprise on August 7, 1992, and Lauderdale on August 20, 1992. Enterprise's notice was filed within thirty days of July 10. Lauderdale timely filed its notice of appeal on August 20, within fourteen days of Enterprise's.

Notices of appeal were also proper in Quitman v. Enterprise. The parties filed their notices of appeal as follows: Quitman on July 27, 1992, and Enterprise on August 7, 1992. Both notices of

---

[12] The effective date of the amendments was December 1, 1993.

appeal were timely filed within thirty days of July 10. Thus, whether the two cases are considered together or separately, the notices of appeal are timely.

C. Concerned Citizens's Rule 59(e) Motion.

Concerned Citizens is not a party to the case, having been denied intervenor status on two occasions. Enterprise and Quitman argue, therefore, that Concerned Citizens's rule 59(e) motion is invalid and does not affect the validity of the notices of appeal.

FED. R. APP. P. 4(a)(4) provides that the time for appeal, usually thirty days, runs from the entry of an order disposing of certain motions, including a motion to alter or amend judgment under rule 59. Because rule 4(a)(4) applies only if a "party makes a timely motion of a type specified immediately below" (emphasis added), it would seem that a motion by a non-party would not defer the thirty-day window.[13] We need not determine whether Concerned Citizens's motion was valid, however, as under the amended appellate rules the validity of Concerned Citizens's motion does not affect the notices of appeal.

If a party makes a rule 59(e) motion, the thirty-day period starts on the day the district court disposes of the motion. See FED. R. APP. P. 4(a)(4). Any notice of appeal filed after the final

---

[13] But see Thurman v. FDIC, 889 F.2d 1441, 1448 (5th Cir. 1989) (holding that a motion for new trial filed by a person who was later determined to have been improperly denied intervenor status was sufficient to trigger the provisions of rule 4(a)(4)); Boggs v. Dravo Corp., 532 F.2d 897, 900 (3d Cir. 1976) (the word "party" in FED. R. APP. P. 4(a)(4) "was never intended to operate as a restrictive rule limiting those who could bring a motion which would have the effect of terminating the time for appeal.").

21

judgment, but before the disposition of the rule 59(e) motion, automatically becomes effective when the district court disposes of the rule 59(e) motion. Id. ("A notice of appeal filed after announcement or entry of the judgment but before entry of any of the above motions is ineffective to appeal from the judgment or order, or part thereof, specified in the notice of appeal, until the date of the entry of the order disposing of the last such motion outstanding.").

Therefore, even if the rule 59(e) motion were valid, the thirty-day period would have commenced on November 16, 1992, the day the district court disposed of the rule 59(e) motion. The three notices of appeal were effective on November 16, 1992.


D.  The Post-judgment Order.

The magistrate judge entered a post-judgment order on November 16, 1992. On November 30, 1992, Quitman filed a rule 59(e) motion to alter or amend the order. Soon afterward, each party filed a notice of appeal of the post-judgment order.[14] As the magistrate judge has not yet disposed of Quitman's rule 59(e) motion, these notices of appeal are ineffective. FED. R. APP. P. 4(a)(4). Thus, we are unable to review the magistrate judge's post-judgment order of November 16, 1992.

Our answer would not be different if the rule 59(e) motion by Concerned Citizens were a valid rule 59(e) motion for purposes of

---

[14] Enterprise filed a notice of appeal on December 1, 1992, Quitman on December 16, and Lauderdale on December 18.

22

rule 4(a)(4)(C). Such a motion would have deferred the effectiveness of the notices of appeal until the motion's disposition on November 16, 1992. On that date, the final judgment would be immediately reviewable on appeal. Because of Quitman's rule 59(e) motion of November 30, 1992, we would still be unable to review the post-judgment order.

One might argue that Quitman's rule 59(e) motion, ostensibly filed in the Quitman v. Enterprise case, defers the notices of appeal only in that case and this court still would have appellate jurisdiction over that portion of the post-judgment order pertaining to the other consolidated suit, Lauderdale v. Enterprise. We reject such a contention. The two cases were consolidated for the purposes of trial and final judgment. Suits that are consolidated in district court for trial and disposed of by one final judgment are considered the same case for the purposes of notices of appeal. Barnett v. Petro-Tex Chem. Corp., 893 F.2d 800, 805 (5th Cir.), cert. denied, 497 U.S. 1025 (1990).

Therefore, we cannot review the contents of the post-judgment order, whether those contents relate to Lauderdale v. Enterprise, Quitman v. Enterprise, or both. Specifically, we cannot review the replacement of the word "maximum" with the word "minimum," the transfer of forty students from Meehan to Enterprise, the allocation to Enterprise of the responsibility for busing students from Northeast Clarke County to the Clarkdale school, the transfer of siblings, or the transfer of children with parents employed by the Clarkdale school or the Enterprise school.

23

IV.  Clarkdale Transfers.

The magistrate judge ordered the transfer of a maximum of 125 white students, and all black students requesting transfers, living in Northeast Clarke County, to attend Lauderdale's Clarkdale school.  The magistrate judge reasoned that, first, the students were closer to Clarkdale and, second, the 1969 desegregation plans for Lauderdale and Enterprise assumed that the transfers would continue.[15]  Enterprise argues that the magistrate judge's transfer of students to Clarkdale should be reversed because (1) Enterprise was not a party to the Lauderdale litigation, (2) the transfers violated the Lauderdale desegregation plan, (3) there is no evidence of a constitutional violation by Enterprise, and (4) the

---

[15] The magistrate judge stated:

Although we have decided that the Northeast Clarke County students attending Clarkdale are transfer students, this will not prohibit transfers to Clarkdale.  Initially, it would make little sense from an academic standpoint to require all Northeast Clarke County students to travel multiple distances to attend Enterprise School when a school constructed for their benefit is located several miles away.  Further, this Court finds that the transfer issue was properly before the Court in USA v. Lauderdale County School District, Cause No. 1367.  During the litigation of Lauderdale County School District, students residing in Northeast Clarke County were attending Clarkdale.  Interrogatories submitted by Lauderdale showed the total number of students residing in Northeast Clarke County and attending Clarkdale.  During the Killingsworth litigation, Enterprise represented to the Court and submitted a map showing the Northeast Clarke County students attending Clarkdale.  Moreover, Enterprise stipulated that its school district is divided into two (2) attendance areas )) Enterprise and Clarkdale.  Lastly, as part of an objection to its HEW desegregation plan, Enterprise submitted statistical compilations showing Northeast Clarke County students attending Clarkdale.  In short, the Court finds sufficient evidence to conclude that both the district court and the Fifth Circuit Court of Appeals were aware that Northeast Clarke County students were attending Clarkdale when desegregation plans were approved for Enterprise and Lauderdale and the Court envisioned such transfers would continue.

24

transfers threaten Enterprise's viability as a district.[16]  Because there has been no finding of a interdistrict segregative act with a substantial, direct, and current segregative effect, and because the 1969 court orders do not compel student transfers, we reverse the magistrate judge's transfers.

In 1962, Lauderdale and Enterprise agreed that white students from the northeastern Clarke County area in Enterprise would attend Clarkdale and that approximately 100 students in the Meehan area in Lauderdale would attend the Enterprise school.  When the agreement expired, Enterprise refused to allow any more transfers of its students to Lauderdale.  Enterprise's denials of requests for transfer were overruled by the Clarke County Board of Education until the board was eliminated in 1991.

The magistrate judge ordered interdistrict transfers, even though neither party had requested it to do so.[17]  Lauderdale asked only for monetary damages in its state court action.  Enterprise in its counterclaim requested only that the 1962 Clarkdale agreement be declared void and that Lauderdale and the Clarke County board be enjoined from ordering the transfer of students to Clarkdale.  But the fact that neither party requested interdistrict transfers does not by itself preclude the district court from ordering such

_____

[16] Apparently, neither party challenges the Meehan transfers, which, as we have pointed out earlier, are not reviewable by this court.

[17] See Milliken v. Bradley, 418 U.S. 717, 745 (1974) ("With no showing of significant violation by the 53 outlying school districts and no evidence of any interdistrict violation or effect, the court went beyond the original theory of the case as framed by the pleadings and mandated a metropolitan area remedy.") (emphasis added).

transfers.  The district court retains jurisdiction to desegregate the schools of Lauderdale and Enterprise.[18]  The district court also has the power to enforce the HEW plan for Lauderdale as well as this court's amendments to the plan.

There is no question that federal courts can stop segregation-promoting transfers of students between school districts, place restrictions upon the transfers such as the <u>Singleton</u> provision contained in many of the HEW plans, and remedy violations of <u>Singleton</u> clauses.  It is a different question, however, whether a court can order the interdistrict transfer of students.  For example, if a school district violates the <u>Singleton</u> provision, the appropriate remedy is to end the illegal transfers, not to order broad interdistrict relief:

> A finding that a school district has accepted transfer students in violation of a <u>Singleton</u> clause customarily supports injunctive relief forcing an end to such transfers and compliance with the terms of the desegregation order.  A finding that a district has violated a <u>Singleton</u> transfer provision included in its desegregation order does not, in and of itself, support a broader, interdistrict remedial order unless the conduct which violated the <u>Singleton</u> clause also comprised an interdistrict constitutional violation when evaluated under <u>Milliken</u>.

<u>Lee v. Lee County Bd. of Educ.</u>, 639 F.2d 1243, 1261 (5th Cir. Mar. 1981).

We evaluate the propriety of court-ordered transfers between districts under the standard enunciated in <u>Milliken v. Bradley</u>, 418

---

[18] <u>See</u> <u>Davis v. E. Baton Rouge Parish Sch. Bd.</u>, 721 F.2d 1425, 1434 (5th Cir. 1983) ("Until [a] unitary system has been achieved, a district court overseeing the desegregation effort must retain jurisdiction to insure that the present effects of past segregation are completely removed." (citing <u>Green v. County Sch. Bd.</u>, 391 U.S. 430, 439 (1968))).

U.S. 717 (1974),[19] in which the Court considered the district court's plan to integrate the city of Detroit district, a predominantly black district, with the predominantly white school districts in the surrounding suburbs. The Court reversed the segregation plan. Although de jure segregation existed in Detroit, the district court had made no finding that the suburban school districts had violated the constitution or that such a violation had an interdistrict effect:

> Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

Id. at 744-45.

This court has noted that Milliken requires that an interdistrict remedy be imposed only upon "proof of unconstitutional governmental action that has been a substantial cause of a significant interdistrict segregative effect." Lee, 639

---

[19] The magistrate judge held that under Mississippi law, students in Northeast Clarke County attending Clarkdale are considered interdistrict transfer students. Neither party contests this holding.

27

F.2d at 1256 (internal quotations omitted).  In <u>Lee</u>, a school district comprising the city of Auburn, Alabama, had been carved out of the larger school district encompassing Lee County.  The county and city school districts reached an agreement whereby some county students would be transferred to city schools.  Because a dual school system existed in both districts, the black students were transferred from their all-black county schools to all-black city schools.  Likewise, the white students were transferred from all white schools in the county to all-white schools in the city.  We held that these past interdistrict transfers did not justify continuing interdistrict remedies:

> [T]he fact that an interdistrict transfer program was formerly used in order to maintain racial segregation in districts operating dual school systems does not support an interdistrict remedial order unless it is established that these transfer programs have a substantial, direct and <u>current</u> segregative effect.  In the absence of such a showing of current segregative effect, . . . no interdistrict remedy is appropriately ordered upon the basis of earlier interdistrict transfer programs.

<u>Id.</u> at 1260.

In the past, Enterprise transferred only its white students to Clarkdale.  With the adoption of the HEW plan in 1969, transfers could occur only if done on a nondiscriminatory basis and if they did not reduce desegregation.  There is no record evidence that the pre-desegregation transfers have a "substantial, direct, and current segregative effect."

Neither the Enterprise desegregation plan nor the Lauderdale desegregation plan, as amended, requires that students continue to be transferred from Enterprise to Lauderdale.  The plans make no

28

mention of any transfers from Enterprise to Clarkdale. From this silence, Lauderdale urges us to infer that the plans intended the transfers to continue, even after the Clarkdale contract had expired. We infer the opposite. The courts and the HEW in 1969 knew that the contract would expire at the end of school year 1986-87, and yet they made no provision to mandate the transfers. We conclude that the 1969 desegregation plans do not mandate the continued transfer of students from Northeast Clarke County to the Clarkdale school.

Enterprise makes a number of other arguments that we need not consider. It contends that the continued viability of the Enterprise school district is essential to the desegregation plan, that the magistrate judge's transfer of students from Enterprise to Clarkdale violates the desegregation plan, that the transfers are void because they significantly contribute to the segregation of the Clarkdale school, and that Enterprise should not be affected by Lauderdale's desegregation order.

Because there is no proof that the pre-desegregation transfers of students from Northeast Clarke County to Clarkdale had any substantial, direct, and current segregative effect, we reverse the magistrate judge's order transferring students from Northeast Clarke County to Clarkdale. We do not, of course, bar Lauderdale and Enterprise from agreeing to future transfers as provided by Mississippi education law. Such transfers, though, must comport with the Singleton provisions of the desegregation plans.

29

V.  Payments for Clarkdale Transfers.

Lauderdale and Enterprise honored the Clarkdale agreement for twenty-three years of its twenty-five-year term.  One notable change during that period was that, beginning with the January 1970 semester, all students, not just white students, residing within the Northeast Clarke County area of Enterprise were transferred for attendance at the Clarkdale school, and all students, not just white students, residing within the Meehan area of Lauderdale desiring to attend were transferred to Enterprise.

Sometime in the 1970's, Lauderdale refused to transfer students in the Meehan area to Enterprise, in violation of the Clarkdale agreement.[20]  Beginning with the academic year 1985-86, Enterprise refused to pay Lauderdale for the students transferred from Northeast Clarke County to Clarkdale.[21]  Lauderdale demanded attendant funds from Enterprise for a six-year period commencing with the 1985-86 school year and continuing through the 1990-91 school year.[22]

In determining how much money was in dispute, the magistrate judge was aided by the fact that the formula for determining attendant funds for the first two of the six school years was contemplated by the parties in their February 13, 1962, contract. Furthermore, Lauderdale and Enterprise have stipulated to the contract formula, figures, calculations, as well as the accuracy of

---

[20] So stipulated by the parties.

[21] The parties have so stipulated.

[22] Its first demand was made in February 1988.

the compilation for those two years.  They have also stipulated to the average daily attendance ("ADA") figures for the academic years 1985-86 through 1991-92 as follows:

ADA of Northeast Clarke County students attending Clarkdale

```
1985-86 - 248.32
1986-87 - 265.75
1987-88 - 263.15
1988-89 - 277.92
1989-90 - 278.31
1990-91 - 266.44
```

ADA of Meehan area (Lauderdale) students attending Enterprise

```
1985-86 - 39.37
1986-87 - 38.85
1987-88 - 37.94
1988-89 - 38.10
1989-90 - 31.19
1990-91 - 40.91
```

The magistrate judge ordered that Enterprise pay Lauderdale for Clarkdale transfer students during the academic years 1985-86 and 1986-87 and during academic years 1987-88 and 1988-89, but not during 1989-90 and 1990-91.  The magistrate judge ordered Enterprise to pay for those interdistrict transfers ordered by the district court for the years 1991-92 and subsequent years.  Finding no error, we affirm.

## A.  1985-86, 1986-87.

The magistrate judge held that Lauderdale had breached its duty to pay attendant funds to Enterprise and ordered Lauderdale to pay Enterprise $29,237.54 for the year 1985-86 and $74,355.05 for the year 1986-87.  These amounts were readily calculated under the Clarkdale agreement.

31

1. No Material Breach by Lauderdale.

Enterprise argues that Lauderdale breached the Clarkdale agreement because it failed to transfer all of its Meehan area students to Enterprise as agreed.[23] This breach, Enterprise argues, voided the agreement and relieved Enterprise of its obligation to pay Lauderdale.

Under Mississippi law, material breach by either party terminates a contract. A breach is material if (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, (2) the breach substantially defeats the contract's purpose, or (3) the breach is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract. UHS-Qualicare v. Gulf Coast Community Hosp., 525 So. 2d 746, 756 (Miss. 1987).

Despite Lauderdale's failure to transfer its Meehan students, Enterprise continued to meet its obligations under the contract without objecting to the method of transportation of the Meehan students for several years. As a result, the magistrate judge held that the failure to transport must not have been a breach of an essential term or condition of the contract, that the failure did not substantially defeat the purpose of the contract, and that the

---

[23] The pertinent provision of the Clarkdale agreement is article VIII, which reads, "The eligible school children of the Lauderdale County School District residing in [the Meehan area] shall be and they are hereby assigned and legally transferred by [the Board of Trustees of the Clarke County Consolidated School District of Lauderdale County, Mississippi, later the Enterprise school district] to the Enterprise Attendance Center of the Clarke County Consolidated School District or its successor for the full term of this agreement."

parties did not consider the term to be vital to the existence of the contract.  We agree.  In addition, article XVI of the Clarkdale agreement provides that breach of one part of the agreement does not justify breach of its other parts.[24]

2.  Enterprise's Offset Argument.

Enterprise argues that it should recover damages for Lauderdale's failure to transfer the Meehan students and that these damages should offset any damages awarded to Lauderdale.  We reject Enterprise's argument on procedural grounds.

In its original answer in state court, Enterprise argued that Lauderdale's breach provided Enterprise with an affirmative defense to its own contract breach:

Third Defense

Affirmative

> The plaintiff has failed to perform as required by said contract.  The plaintiff has wholly failed for approximately ten years to perform pursuant to Paragraph III of said agreement.  The plaintiff has wholly failed to perform pursuant to Paragraphs VIII and IX of said agreement for at least a twenty year period in that it did not assign, transfer and transport all children in the geographical area eligible under the agreement to the Enterprise School District.
>
> And now having fully answered said complaint, these defendants respectfully pray that the Complaint for Declaratory Judgment filed herein against them be dismissed at the cost of the plaintiff.

The next section of Enterprise's answer is labeled "Counterclaim,"

---

[24]  Article XVI provides, "The breach of any part of this agreement by either party thereto shall not alter the binding effect of all other covenants and agreements herein contained upon both of said parties."

thus indicating that Enterprise meant to raise the Meehan breach as an affirmative defense rather than a counterclaim. The counterclaim section ended with the following requests for relief, none of which relates to the Meehan transfers: that the Clarkdale agreement be declared null and void, that attempts by the Clarke County board and by Lauderdale to transfer Northeast Clarke County students be declared null and void, that Lauderdale be enjoined from accepting such students, that the Clarke County board be enjoined from transferring or transporting such students, and that Enterprise be awarded reasonable attorneys' fees and court costs.

Ordinarily we would need to consider whether Enterprise's claim against Lauderdale for breach of contract is a counterclaim, and, if so, whether Enterprise's failure to raise the counterclaim waives the claim under FED. R. CIV. P. 13(a). Furthermore, we might need to consider whether Enterprise's argument was erroneously pled as an affirmative defense and whether the district court abused its discretion in refusing to treat the argument as a counterclaim. See FED. R. CIV. P. 8(c). We need not address these issues, however, as Enterprise raises the argument that it should recover damages for the Meehan breach for the first time on appeal, so we decline to consider the argument. See Oliver v. Collins, 914 F.2d 56, 60 (5th Cir. 1990).

### 3. Void As Unconstitutional.

Enterprise alleges that the Clarkdale agreement is unconstitutionally void because it provided that Clarkdale would be

34

a "white attendance center." Before 1970, only white students in Northeast Clarke County were able to transfer to Clarkdale; black students continued to attend the segregated black school in Enterprise.

In September 1970, this course of conduct changed. Lauderdale and Enterprise began to transfer students of both races, presumably in order to comply with the Singleton provision of the HEW plans for each respective school district.

Under Mississippi state law, the subsequent actions of the parties may modify the contract to an extent consistent with the subsequent course of conduct. Broome Constr. Co. v. Beaver Lake Recreational Ctr., 229 So. 2d 545, 547 (Miss. 1969). We believe that the Clarkdale agreement was modified so as to permit the transfer of blacks. Therefore, the agreement is not unconstitutionally void, and the magistrate judge did not err in relying upon the agreement to award Lauderdale recovery for the 1985-86 and 1987-87 academic years.

## B.  1987-88, 1988-89.

The Clarkdale agreement expired at the end of the 1986-87 year. Thereafter, any rights of Lauderdale to payment were governed by Mississippi law. During the school years 1987-88 and 1988-89, MISS. CODE ANN. § 37-19-27 read:

> Legally transferred students going from one school district to another shall be counted for supportive services by the school district wherein the pupils attend school, including maintenance costs, but shall be counted for transportation allotment purposes in the school district which furnishes or provides the transportation.

35

When such transfer shall be from school district to another, the superintendent of schools of the school district from which said students are transferred shall, within thirty (30) days after a request in writing to do so by the superintendent of schools of the other school district, issue his warrant in an amount equal to the total number of pupils attending the school from such school district multiplied by the average expenditure pupil in the school district from which the pupils are transferred, on the maintenance fund to pay any sums due hereunder to the said school district wherein the said students are attending. His failure to do so shall render him liable therefor in the amount thereof on his official bond.

1986 Miss. Laws ch. 492, § 104 (amended 1989).

The basic purpose of the statute was to require local funds to follow transfer students. To that end, the statute required the district superintendent of the transferring school district to request in writing that the superintendent of the receiving school district issue his warrant identifying the funds requested.

Lauderdale did make such a request in writing for the funds due from Enterprise. Enterprise District Superintendent Michael Taylor brought the request to the attention of the Enterprise board, which unanimously voted not to pay funds to Lauderdale. As a result, Taylor failed to issue his warrant.

The magistrate judge held that a forfeiture of Taylor's official bond would be inequitable because his actions were controlled by his school board. The magistrate judge awarded Lauderdale $96,731.95 for the 1987-88 school year and $102,237.76 for the 1988-89 school year. Enterprise does not dispute this award on appeal.

36

C.   1989-90 and 1990-91.

The magistrate judge refused to award Lauderdale any student money for 1989-90 and 1990-91.[25]  In 1989, § 37-19-27 was amended to require school boards approving student transfers to enter into contracts for the payment or nonpayment of any portion of their local maintenance funds that they deem fair and equitable.  Because Lauderdale and Enterprise did not enter into any such arrangement, the magistrate judge held that neither party was obligated to pay transfer funds for the years beginning with the year 1989-90.

Lauderdale does not dispute the magistrate judge's interpretation of MISS. CODE. ANN. § 37-19-27 but argues that it should recover funds under the theory of quantum meruit.  In order to recover under quantum meruit, a plaintiff must show (1) that it rendered services under the reasonable expectation that it would be paid and (2) that the defendant knew that the services were being performed with the expectation that it would pay for the work. Redd v. L & A Contracting Co., 151 So. 2d 205, 209 (Miss. 1963).

Lauderdale argues that Enterprise should have known that Lauderdale expected payment because Lauderdale had made written demands on Enterprise.  The Mississippi statutory scheme belies Lauderdale's argument.  The Mississippi statutes, beginning in 1989, required school boards to enter into agreements to divide money allocated to transfer students.  MISS. CODE ANN. § 37-19-27. Because the Clarke County board failed to enter into an agreement,

_____

[25] Apparently, no question of attendant funds for the years 1991-92 was litigated.

37

and because the twenty-five-year contract had expired, it had no reasonable expectation of payment from Lauderdale.

D.  1992-93 and Subsequent Years.

For 1992-93 and subsequent years, the district court ordered Enterprise to transfer certain students to Clarkdale and ordered Enterprise to make payments to Lauderdale for the transfers. Although we reverse the transfers, we affirm that Enterprise should pay for any transfers made under the authority of the magistrate judge.

VI.  Stonewall Annexation.

The magistrate judge held that the Stonewall area had been validly annexed by Quitman for two reasons.  First, Enterprise was equitably estopped from arguing that the Stonewall area was improperly annexed to Quitman.  Second, Quitman's control over the Stonewall area would comport with Killingsworth.  We agree.

In 1956, pursuant to 1953 Mississippi Laws, Extraordinary Session, chapter 12, the schools of Clarke County were reorganized into the Enterprise and Quitman districts.  Enterprise (then the Clarke County Consolidated School District) comprised the northern third of Clarke County, including the Stonewall area.  Quitman (then the Quitman Consolidated School District) comprised the southern two-thirds of Clarke County.  The state laws created a county school board with limited authority over both districts.

After reorganization, Enterprise's two de jure black schools,

38

an elementary school and a high school, served black students in Enterprise and Stonewall. The two _de jure_ white schools in Enterprise, an elementary school and a high school, served all the white students in the district, with the exception of the white students living in the Stonewall area, who attended the Stonewall school.

In March 1961, the Enterprise board announced an intention to convert the Stonewall school to an elementary school for grades one through six.[26] Stonewall students in grades seven through twelve would be required to attend the _de jure_ white Enterprise high school. Upon learning of the Enterprise board's intent to convert the Stonewall school, parents and community members of Stonewall filed a petition requesting the detachment of the Stonewall area from Enterprise and annexation to Quitman.[27] The petition contained a total of 639 qualified electors of the Stonewall area.

The Quitman board unanimously passed a resolution approving the annexation of the Stonewall area, which would "become effective when approved as required by law, on July 1, 1962."[28] Over the objections of some of the citizens of the Stonewall area, the Enterprise board adopted a long-range plan providing for the conversion of the Stonewall school.[29] The next day, Enterprise met with the Clarke County board concerning the long range plan and the

[26] March 5, 1962.

[27] March 10, 1962.

[28] March 12, 1962.

[29] March 13, 1962.

39

annexation of the Stonewall area to Quitman.  At this meeting, the Clarke County board tabled Enterprise's long-range plan and adopted a resolution detaching the Stonewall territory from Enterprise and annexing it to Quitman.

Enterprise appealed the Clarke County board's annexation decision to the Circuit Court of Clarke County.  Griffin v. Clarke County Bd. of Educ., No. 6176 (Miss. Ch. filed Mar. 23, 1962).  The citizens of the Stonewall area filed an injunction against Enterprise in the Chancery Court of Clarke County.  Green v. Cooper, No. 6788 (Miss Ch. filed Mar. 30, 1962).  The complaint alleged that Enterprise, in seeking to convert the Stonewall school, acted arbitrarily, capriciously, and without regard to the general welfare, health, and morals of the affected students. Moreover, the complaint alleged that Enterprise did not have the facilities to accept the 216 white Stonewall students in grades six to eleven who would be required to attend the white Enterprise school.

The Clarke County board adopted a resolution disapproving the conversion of the Stonewall school.  The resolution stated that Enterprise did not have sufficient existing facilities properly and adequately to teach students in grades seven through twelve without the Stonewall high school.[30]  The Clarke County board was granted leave to intervene in the Green v. Cooper, No. 6788 (Miss Ch. filed Mar. 30, 1962), to enjoin Enterprise from converting the Stonewall

---

[30] April 2, 1962.

40

school.[31]  Enterprise filed a petition for writ of certiorari against the Clarke County board, seeking to set aside the board's resolution disapproving the conversion of the Stonewall school. Williams v. Riley, No. 6182 (Miss. Cir. Ct. filed May 1, 1962).

After these suits were filed, Enterprise and Quitman entered into extensive negotiations in an attempt to resolve the problems surrounding the Stonewall area.  On May 15, 1962, the Enterprise and Quitman boards, Clarke County's and Quitman's superintendents, a member of the State Educational Finance Commission, the Executive Secretary of the State Educational Finance Commission, four members of the Clarke County board, and two citizens of the Stonewall territory met and discussed at length the annexation of Stonewall and other proposals for the continued education of the students living in the Stonewall area.

Enterprise and Quitman entered into a compromise memorialized in scattered documents, school board minutes, and an agreement dated June 11, 1962.[32]  The magistrate judge found that the

---

[31] April 13, 1962.

[32] The most important sources of the agreement are a proposal by the Enterprise superintendent, a counterproposal by the Quitman superintendent, and the agreement of June 11, 1969, between Enterprise and Quitman.  The proposal of the Enterprises superintendent reads:

I       The suit of Green vs. Cooper (Injunction) to be dismissed.

II      Williams vs. Riley (6182) in Circuit Court dismissed (Appeal from order of County Board of Education April 2 disapproving District Board order of March 5).

III     Order of April 2 of County Board to be rescinded.

IV      Order of March 5 of Clarke County District Board to be amended in Section I(b) to read as follows:  "Grades 1 through 8 to be taught at Stonewall".

(continued...)

compromise consisted of six major parts:  (1) The Stonewall

territory would be detached from Enterprise and annexed to Quitman,

(2) all black students residing in the Stonewall area would be

transferred to the all-black schools located in Enterprise;

(3) state funds would be paid to the school district where the

[32](...continued)

V    Griffin vs. Board of Education (6176) Appeal on Bill of
     Exceptions from transfer of territory dismissed.

VI   Order of County Board of Education of March 14 to be rescinded
     (Transfer of Territory).

VII  Stewart vs. Rathburn dismissed.

VIII All high school students now attending Stonewall to be
     transferred to any attendance center which will accept them
     and pro rata share of District and state funds and teacher
     units to follow child.  Buses to be run to Enterprise and
     Quitman, all other transfers will furnish their own
     transportation.

IX   Long Range Plan of March 13th to be amended as follows and
     approved by district and county boards.

     1.   Stonewall School to have grades 1-8.

     2.   Construction and renovation immediately with
          equal priority of Items 2, 3, 5, 6 and 7, total
          cost - $110,000.00.

     3.   Item 4 next priority.

X    State funds, 16th Section Funds and $45,000.00 negotiable
     notes to be used to finance improvements to be made this
     summer.

The counter-proposal from the superintendent of Quitman to the president of the
Clarke County board proposed an agreement whereby, among other things, Quitman
agreed that it would transfer children living in the Stonewall area to the black
school in the Clarke County district and that Quitman would agree not to operate
a high school in Stonewall during the 1962-63 school year.  The letter began,
"Relative to the proposed annexation of the former Stonewall Consolidated School
District to the Quitman Consolidated School District."  The letter noted that the
Quitman school board had adopted, by motion, the contents of the letter on
June 5, 1969.

    The June 11, 1969, agreement provided that all blacks in the Stonewall area
would be transferred from Quitman to Enterprise, that state funds for each
student should be paid to the district at which the child attends, that the
agreement would be effective upon approval by the Board of Education of Clarke
County and the State Education Finance Commission, and that the agreement should
continue for 25 years.

student attends school, (4) the agreement would be effective upon approval by the Clarke County board and the State Education Finance Commission, (5) <u>Griffin v. Clarke County Board of Education</u>,[33] <u>Green v. Cooper</u>,[34] and <u>Williams v. Riley</u>[35] would be dismissed, (6) and the agreement would continue for a period of twenty-five years.

On June 11, 1962, the Enterprise and Quitman boards approved the transfer of blacks from Quitman to Enterprise. On June 12, 1962, the Clarke County board approved the June 11, 1962, agreement. On June 18, 1962, the Mississippi Educational Finance Commission approved the annexation of the Stonewall territory and the June 11, 1962, agreement. For ease of discussion, we refer to the entire compromise as the "Stonewall compromise agreement" and the June 11, 1962, agreement related to transfers as the "June 11, 1962, agreement."

On May 21, 1965, suit was filed in federal district court against Enterprise, Quitman, and the Clarke County board, seeking to dismantle the dual school system being operated in Clarke County. <u>Killingsworth v. Enterprise Consolidated Sch. Dist.</u>, No. 1302(E). Quitman and Enterprise, pursuant to the preliminary orders entered in the <u>Killingsworth</u> case, submitted desegregation plans that incorporated a grade-by-grade "freedom of choice" concept. These plans were tentatively accepted on August 5, 1965,

---

[33] No. 0176 (Miss. Ch. filed Mar. 23, 1962) (the annexation appeal case).

[34] No. 6788 (Miss. Ch. filed Mar. 30, 1962) (the Stonewall injunction case).

[35] No. 6182 (Miss. Cir. Ct. filed May 1, 1962) (Enterprise's petition for certiorari).

and revised on September 22, 1966.

Through discovery, the Killingsworth plaintiffs were made aware of the June 11, 1962, agreement. On June 14, 1967, the plaintiffs filed for supplemental relief, requesting the district court to declare the June 11, 1962, agreement unconstitutional. In its final order, issued July 19, 1967, the district court in Killingsworth did not decide the constitutionality of either the June 11, 1962, agreement or the annexation of Stonewall by Quitman.

The Killingsworth court's final order held that the previously approved "freedom of choice" plans failed to meet the standards for desegregation. The court specifically enjoined Enterprise, Quitman, and the Clarke County board from discriminating on the basis of race or color, ordered Enterprise, Quitman and the Clarke County board to take affirmative "action to disestablish all school segregation and to eliminate the effects of the dual school system," allowed all students irrespective of race or color to exercise their choice of which school to attend in their respective school districts, held that overcrowding of the particular school chosen would be the only reason for denying a student's choice of which school to attend, and held that there would be no interdistrict transfers between Enterprise and Quitman "except on terms and by procedures generally applicable regardless of race."

On July 3, 1969, this court reversed and remanded Killingsworth, requiring desegregation plans to be filed by August 27, 1969. The court further ordered that if no plan were submitted by the respective school districts, HEW could file a desegregation

44

proposal on August 11, 1969, and the parties could object thereto. On August 11, 1969, HEW filed separate desegregation plans for Enterprise and Quitman. Enterprise objected to its HEW plan, filing a motion to strike and to stay action on the plan.

The HEW plans for both Enterprise and Quitman called for immediate desegregation of all schools, including teachers and staff members. Intradistrict transfers are not allowed under the plans unless the student seeking the transfer would be a minority in the transferee school. The Singleton provisions in the plans permitted a school board to grant interdistrict transfers only "on a non-discriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual school system." On November 6, 1969, this court ruled that the desegregation plans filed by HEW would be implemented immediately.

For each school year between 1968-69 and 1990-91, some students residing in the Stonewall area filed petitions requesting transfers from Quitman to Enterprise. The procedure has been as follows:

(1) Quitman for each school year after 1968-69 has consistently denied such requests for transfer by Stonewall students to attend school in the Enterprise School District.

(2) Such Stonewall students, upon being denied approval of their transfer requests by Quitman, have appealed to the Clarke County Board of Education to overrule the action of Quitman in denying such requests for transfer; and

(3) In each and every case after 1968-69 the Clarke County Board of Education has overruled Quitman and approved the requests for transfers.

45

The Mississippi legislature phased out county-wide boards of education effective January 1, 1992. Consequently, the appeal process by which some Stonewall students attended Enterprise was eliminated.

The magistrate judge held that Enterprise was equitably estopped from arguing that Stonewall was not annexed to Quitman and that the annexation was resolved in <u>Killingsworth</u>. Enterprise argues that the entire 1962 Stonewall agreement is void because it is unconstitutional. Enterprise contends that the annexation of Stonewall by Quitman cannot be legally separated from the transfer of all black Stonewall children to Enterprise and that both actions should be voided. We agree. The annexation should be viewed separately from the rest of the agreement. By itself, the annexation is constitutional.

## A. Equitable Estoppel.

Equitable estoppel requires three elements: "(1) Belief and reliance on some representation; (2) Change of position as a result thereof; (3) Detriment or prejudice caused by the change of position." <u>Suggs v. Town of Caledonia</u>, 470 So. 2d 1055, 1057 (Miss. 1985) (citing <u>Covington County v. Page</u>, 456 So. 2d 739 (Miss. 1984)). The magistrate judge held that Quitman made a representation that the Stonewall territory was lawfully a part of Quitman, that Quitman had sufficiently relied upon these representations, and that Quitman suffered detriment as a result of Enterprise's representations.

46

Enterprise admitted that Stonewall belonged to Quitman during the pendency of Killingsworth.  During a December 3, 1969, hearing, Enterprise submitted as evidence a map showing the Stonewall area as part of Quitman.  Enterprise's superintendent testified under oath that the Stonewall territory was annexed to Quitman in 1962.  The transcript of the hearing reads:

Q:  We've indicated on the map introduced into evidence by stipulation known as the Stonewall area, when was that area detached from the Enterprise School District and made a part of the Quitman district?

A:  I believe this was in 1962.

Furthermore, in its objection to HEW's desegregation plan for Enterprise, Enterprise admitted that Stonewall was part of Quitman.  Enterprise's objection reads:

The foregoing facts demonstrate beyond doubt that [Enterprise] is dependent for its financial solvency, the quality of its educational program and its very existence upon pupils who reside outside of [Enterprise] but who have elected to attend the schools administered by [Enterprise].

If and when Stonewall Elementary School is closed, the Enterprise Elementary School must be prepared to accommodate additional students from the Stonewall Attendance Zone of the Quitman Consolidated School District, who will, without doubt, elect to attend school at Enterprise.

(emphasis added).  For over twenty-six years, from June 1962 until June 17, 1988, when suit was filed, Enterprise did nothing to indicate that the Stonewall area had not lawfully been annexed to Quitman.

On appeal, Enterprise asserts that a representation may not be used as a basis for equitable estoppel unless the other party is

47

ignorant of the true facts.  See Chapman v. Chapman, 473 So. 2d 467, 470 (Miss. 1985).  Although it is true that Quitman was fully aware of the facts surrounding the annexation, Quitman was unaware that Enterprise would suddenly challenge the annexation after decades of acquiescence.  Equitable estoppel applies to parties who take inconsistent positions.  See United States v. Dallas County Commission, 548 F. Supp. 794, 872-75 (S.D. Ala. 1982), aff'd in part, rev'd in part on other grounds, 739 F.2d 1529 (11th Cir. 1984), and authorities cited therein.

Enterprise also argues that the doctrine of equitable estoppel cannot be used to bar the invocation of constitutional rights.  The admittedly sparse authority on applicability of equitable estoppel indicates the opposite.  Two district courts have held that parties were equitably estopped from arguing constitutional violations.  In Williams v. City of Dothan, 745 F.2d 1406 (11th Cir. 1984), the district court applied equitable estoppel, although the court of appeals reversed on the ground that the elements of equitable estoppel had not been met.  Id. at 1410.  In Dallas County Commission, the district court, in an alternative holding, held that a party was equitably estopped from arguing a constitutional right.  548 F. Supp. at 872-75.  The doctrine of laches, which is similar to equitable estoppel,[36] may prevent a plaintiff from enjoining changes effected without preclearance as required by the

---

[36] A party asserting laches must show "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."  Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021, 1026 (5th Cir.), cert. denied, 434 U.S. 836 (1977).

Voting Rights Act of 1965.[37]  Lopez v. Hale County, 797 F. Supp. 547, 550-52 (N.D. Tex. 1992) (three-judge court), aff'd mem., 113 S. Ct. 954 (1993); but see Dotson v. City of Indianola, 514 F. Supp. 397, 400-01 (N.D. Miss. 1981), aff'd mem., 455 U.S. 936 (1982).  Enterprise therefore lacks legal support for its argument that equitable estoppel is inapplicable to constitutional claims.

Enterprise argues that equitable estoppel is inapplicable to a governmental entity that is asserting the constitutional rights of a large group of people.  We have found no authority to support such a proposition.

Enterprise also claims that, in a suit against a state political subdivision, the doctrine of equitable estoppel applies only if the plaintiff is a private individual and not another state political subdivision.  Rye, the case cited by Enterprise, holds, however, that the doctrine may apply to suits by private individual against political subdivisions.  It does not foreclose application in other circumstances:  "The State, its counties, subdivisions and municipalities may be equitably estopped under the proper circumstances."  521 So. 2d at 908-09.

Enterprise argues that Quitman's belief in the validity of the annexation did not harm Quitman.  We disagree.  Quitman planned, budgeted, forecasted, funded, hired teachers and staff members, paid taxes, and maintained school property since June 11, 1962,

---

[37] Although there appears to be no bar under constitutional law to the use of the doctrine of laches, under Mississippi law "the State is not responsible for the laches of its officers."  Bd. of Trustees of Monroe County Bd. of Educ. v. Rye, 521 So. 2d 900, 908 (Miss. 1988).

under the assumption that the Stonewall territory was properly annexed.  Although Quitman received tax revenues from property in the Stonewall district, Quitman was deprived of state funding for those students who transferred to Enterprise.

Next, Enterprise claims that it affirmatively made demands on Quitman to pay money to Enterprise.  But this has nothing to do with Enterprise's failure to argue that it owned the Stonewall area, or its representations that it did not own the Stonewall area.  We therefore agree with the magistrate judge that Enterprise is equitably estopped from challenging the validity of the Stonewall annexation.

## B.  Killingsworth.

The magistrate judge held that Killingsworth adjudicated ownership of the Stonewall area.  Enterprise disagrees, arguing that the issue of annexation was never directly litigated in Killingsworth, and therefore it should not be inferred that the Killingsworth court approved the Stonewall annexation.

The final desegregation orders in Killingsworth were based upon interdistrict boundaries that assumed the validity of the annexation of Stonewall by Quitman.  Although neither the three-judge district court nor this court in Killingsworth specifically ruled on the validity of the annexation, they did not have cause to do so.  All parties, including Enterprise, represented to the court that the annexation was valid.  Thus, it is not surprising that the record in Killingsworth reveals no debate about the validity of the

50

Stonewall transfers.  We agree with the magistrate judge that it is far too late for Enterprise to protest the annexation.

## C.  Separability.

Enterprise argues that the annexation of Stonewall is void because it is tainted by the unconstitutionality of the June 11, 1969, transfer agreement.  The magistrate judge treated the annexation of Stonewall and the transfer of black students from Stonewall as a part of a larger agreement.  The magistrate's factual finding is not clearly erroneous.  See FED. R. CIV. P. 52(a).  But even assuming that the Stonewall annexation and June 11, 1969, transfer agreement are linked, the annexation is not void.

The annexation of Stonewall was completed under procedures provided by state law.  School districts in Mississippi are political subdivisions, and state law provides procedures for changing their boundaries.  In 1962, the statutory annexation procedure was contained in MISS. CODE ANN. § 6274-06, which provided:

> If a petition signed by a majority of the qualified electors of specifically described territory of an existing school district shall be filed with the county board of education requesting that said described territory be taken from such existing district and annexed to an adjacent district, the county board of education, after consideration thereof, and with the consent and approval of the board of trustees of the district to which such territory is to be annexed, shall have the power and authority, in its discretion to take such territory from the existing district and annex same to the adjacent district. However, before doing so, the county board of education must find and determine that the taking of the territory from the existing school district will not seriously interfere with or impair the efficiency of such school district, and all orders

51

adopted under the provisions of this section shall be invalid unless such finding and determination be made.

A review of the record show that the necessary steps were fulfilled. A petition was filed with the Clarke County Superintendent of Education on March 10, 1962; the Quitman board consented to the annexation on March 12, 1960; the Clarke County board consented to the annexation on March 14, 1960. It was only later that Enterprise sued to challenge the annexation (Griffin v. Clarke County Bd. of Educ.). We accept as true the magistrate judge's finding that Enterprise's court challenge was dropped as part of the Stonewall compromise agreement, an agreement that included that June 11, 1969, contract. We are unable to tell from the record why Enterprise dropped its legal challenge to the annexation. Perhaps Enterprise believed that its receipt of transfer students and their attendant funds compensated it for dropping the lawsuit; or, perhaps Enterprise's appeal had no legal merit.

An action by a state or its political subdivisions pursuant to established political procedures is not unconstitutional merely because the support for such an action is garnered through the promise of an unconstitutional agreement. Thus, the annexation is not void merely because Quitman's agreement to transfer the black Stonewall students may have procured Enterprise's agreement to drop its lawsuit.

Enterprise argues that if any part of an unconstitutional agreement is void, all of its provisions must be voided. Even assuming that the political act of annexation can be linked to the

52

rest of the compromise agreement, we find Enterprise's argument unpersuasive. None of the authorities cited by Enterprise stands for the proposition that an entire agreement is void if one of its parts or provisions is unconstitutional.[38]

## D. Constitutional Validity of Annexation.

A boundary change is void only if it contributes to segregation.[39] The Stonewall annexation did not have the effect of increasing segregation. Neither before, nor immediately after the annexation, did any black student in either of the two school districts go to the same school with a white student. The Stonewall annexation was no more promotive of segregation than was any of the other pre-segregation boundary changes among Mississippi's school districts. As Quitman points out, Stonewall originally belonged to the Quitman school district and was later transferred to Enterprise under Mississippi's 1953 school reorganization. If all school district boundary changes during segregation were constitutionally void, then both the original transfer of Stonewall to Enterprise, and its later return to Enterprise, are void. Thus, Stonewall would belong to Quitman.

---

[38] One case actually seems to show the opposite. In Shelley v. Kraemer, 334 U.S. 1 (1948), the Court held a state could not enforce a restrictive covenant to prevent a black person from taking possession of a house. It would have been self-defeating to void the original sale of the house containing the restrictive covenant, as that would have broken the chain of title, thus jeopardizing the black purchaser's right of possession. Because this was the very right vindicated by the Court, we reject the idea that an unconstitutional clause in a contract automatically voids the entire contract.

[39] For example, the annexation of a predominantly white territory by a predominantly white school district might be void.

E.  Material Breach by Quitman.

Enterprise argues that Quitman materially breached the agreement by failing to pay money to Enterprise for students transferred from Quitman to Enterprise.  Enterprise claims that, therefore, it is not obligated to honor the part of the agreement transferring Stonewall to Quitman.  But even though Quitman stopped honoring the transfer agreement in 1968, only now does Enterprise claim that the annexation is void because of Quitman's "material breach."  Just as Enterprise is equitably estopped from arguing that the annexation is void as unconstitutional, Enterprise is equitably estopped from arguing that the annexation is void for material breach by Quitman.

VII.  Transfers from Stonewall to Enterprise.

The magistrate judge ordered the transfer of 100 to 125 black students from the Stonewall area to Enterprise.  Quitman opposes the transfer, arguing that the transfer is not necessitated by Killingsworth and that there has been no showing of constitutional violation.  We agree with Quitman and reverse the magistrate judge.

The Stonewall area is lawfully annexed to the Quitman district.  Therefore, the transfer of black students ordered by the magistrate judge is an interdistrict transfer properly analyzed under Milliken.  There has been no showing of a government action with substantial direct, or current segregative, effect.  See Lee, 639 F.2d at 1260.

54

The annexation of Stonewall was not an interdistrict act of segregation, nor was the transfer agreement. Mississippi schools were completely segregated before the transfers. After the transfers, they were still completely segregated. Furthermore, the transfer agreement has no current segregative effect, because it is no longer operable. Absent a finding of an interdistrict act, segregative intent, and a continuing segregative effect, the magistrate judge had no discretion to order the transfer of students from Stonewall to Quitman.

Killingsworth did not require the interdistrict transfers from Quitman to Enterprise. The orders of the three-judge court in Killingsworth were reversed. United States v. Hinds County Sch. Bd., 423 F.2d 1264 (5th Cir. 1969), cert. denied., 396 U.S. 1032 (1970). This court did nothing more than order immediate implementation of the HEW plans for Enterprise and Quitman. Although the HEW plans prohibited certain interdistrict transfers, they did not affirmatively mandate any transfers.

Merely because the Killingsworth court was aware of interdistrict transfers does not mean it approved of them. See United States v. Hinds County Sch. Bd., 516 F.2d 974, 975 (5th Cir. 1975) (holding that the fact that the 1969 order did not dismantle school bus routes designed for a segregated school system does not mean that the order approved of the bus routes). Furthermore, the Killingsworth courts were aware that the transfer agreement would end in twenty-five years. Thus, if awareness is equated with approval, Killingsworth actually would require the cessation of

55

interdistrict transfers under the June 11, 1962, agreement.

The magistrate judge believed that the transfers of black students from Stonewall was essential to maintain Enterprise. Since the Killingsworth desegregation order, Enterprise has had a total student enrollment between 768 and 858. The Enterprise superintendent testified that in order to maintain its accreditation, the school needs from 900 to 1,110 students. The magistrate judge crafted his order so that enough students attended Enterprise for it to remain viable.

The decision of this court eliminating transfers both to and from the Enterprise will not significantly reduce the Enterprise school system. Even so, we do not think that Enterprise's viability should be a dominant factor in drafting interdistrict transfers. If insufficient students are transferred to Enterprise by court order, the consequences are not necessarily disastrous. Enterprise could get more students by transferring more students from other districts, so long as these transfers comport with the desegregation orders and Mississippi state law. Enterprise could attempt to annex more territory, subject to the same conditions. If these methods fail, the Enterprise district could be dissolved, provided that the district court is satisfied that the elimination of the district would not reduce desegregation.

In conclusion, the transfer is not necessary to remedy an interdistrict violation, to comply with the Killingsworth order, or to maintain Enterprises's viability. The magistrate judge abused his discretion in ordering the transfer of students from Stonewall

to Enterprise.

VIII.  Funds for Students Transferred from Stonewall.

Enterprise seeks to recover money from Quitman for Stonewall students transferred from Quitman to Enterprise.  Because the applicable Mississippi law has changed over the years, we approach this issue chronologically.

A.  1968-69 Through 1986-87.

The magistrate judge held that Enterprise should recover from Quitman for the years 1987-88 but not for previous and subsequent school years.  Finding no error, we affirm.

We briefly explain the relevant facts.  Beginning with the June 11, 1962, agreement, black Stonewall students were transferred from the Stonewall area to Enterprise.  At the end of the 1967-68 school year, Quitman refused to pay Enterprise any transfer funds and denied the requests by Stonewall students to transfer to Enterprise.  The Clarke County board overruled Quitman's denials of the transfer requests.

On April 12, 1973, Enterprise's lawyer sent a letter to the Quitman superintendent requesting payment of "certain funds" the Enterprise board considered due to Enterprise.  On January 9, 1974, Quitman's superintendent indicated that the Quitman school board had reviewed Enterprise's letter and had taken no action.[40]

---

[40] On December 14, 1973, the Enterprise superintendent stated to the Quitman superintendent that Enterprise considered the June 11, 1962, contract to
(continued...)

Enterprise again requested funds on April 10, 1973, September 11, 1973, November 25, 1975, March 8, 1977, June 4, 1987, February 18, 1988, and October 26, 1988.

Beginning in December 1988, the magistrate judge signed a series of orders staying the collection of transfer funds and preserving all claims to funds. The entry of these orders did not relieve the parties of their obligations and liabilities under the applicable Mississippi Code provisions.

No law allows Enterprise to recover during the applicable time period. Enterprise cannot recover funds under the June 11, 1962, agreement because, as Enterprise admits in its brief, the agreement is void as unconstitutional. The magistrate judge held that during 1968-69 to 1986-87, no Mississippi statute provided for the interdistrict payment of funds. A review of the applicable law during this period confirms the magistrate judge's conclusion.

In 1962, the Mississippi legislature enacted a statute allowing the transfer of individual students from one school district to another by the mutual consent of the boards of trustees of all school districts concerned. 1962 Miss Laws, ch. 357, § 1, codified at MISS CODE ANN. § 6248-07 (effective May 10, 1962). The section provided that certain state funding would follow a transferred student:

> Legally transferred students going from one school
> district to another shall be counted for teacher

---

[40](...continued)
be valid, except as to the reference to the race of the students. At some time, Enterprise had submitted a race-neutral contract to Quitman for approval, but Quitman never approved it.

allotment and allotments for other current costs by the school district wherein the pupils attend school; but shall be counted for transportation allotment purposes in the school district which furnishes or provides the transportation.

Id. The statute made no provision for payments between districts. In 1972, the legislature transferred part of the 1962 provision to a newly-created § 37-19-33 (later renumbered § 37-19-27), entitled "Counting of legally transferred students." Section 37-19-33 contained the same language in the 1962 law quoted above, except that if there was a transfer from one county to another, the county at which a child attended school would pay the county of residence a fee equal to the average cost of educating a child in the county of residence multiplied by the number of students transferred.[41] In 1978, § 37-19-33 was renumbered as § 37-19-27.

The 1962 statute does not speak to the allocation of payments. Only in 1987 was § 37-19-27 amended to provide for payments. Therefore, the magistrate judge was correct in concluding that no

---

[41] Section 37-19-33 provided in full:

Students going from one school district to another, other than a municipal separate school district shall be counted for teacher allotment and allotments for other current costs by the school district wherein the pupils attend school, including maintenance costs; but shall be counted for transportation allotment purposes in the school district which furnishes or provides the transportation. When such transfer shall be from one county to another, the county superintendent of education of the county from which said students are transferred shall, within thirty days after a request in writing to do so by the county superintendent of education of the other county, issue his warrant in an amount equal to the total number of pupils attending the school from such county multiplied by the average expenditure per pupil in the county form which the pupils are transferred, on the maintenance fund to pay any sums due hereunder to the said school district wherein the said students are attending. His failure to do so renders him liable therefore in the amount thereof on his official bond.

MISS. CODE ANN. § 37-19-33 (1972). Also in 1972, the legislature enacted § 37-15-31.

59

Mississippi law required Quitman to pay Enterprise for the Stonewall transfer students.

Enterprise argues that it is entitled to recover funds under a theory of quantum meruit. Quitman has consistently refused to pay money since 1968, and it repudiated the entire agreement in 1977. Under these circumstances, Enterprise did not have a reasonable expectation of compensation, and therefore it should not recover on a theory of quantum meruit.

The magistrate judge held that Enterprise is equitably estopped from asserting claims to funds due for the years 1968-69 to 1986-87. The magistrate judge found that Quitman stopped paying transfer funds in 1968, that Enterprise made its first demand for payment in 1973, that Enterprise made its second demand in 1987, and that during the intervening fourteen years, Enterprise never initiated suit on the debt it alleged to be due from Quitman.

Enterprise argues that the magistrate judge erred in finding that Enterprise made no demands upon Quitman from 1973 to 1987. It appears that the magistrate judge failed to note that Enterprise made additional demands on April 10, 1973, for the 1968-69, 1969-70, and 1971-72 academic years; on September 11, 1973, for the 1972-73 academic year; on November 25, 1975, for the 1973-74 and 1974-75 academic years; and on March 8, 1977, for the 1975-76 academic year.

We need not reach the issue of whether the magistrate judge made an erroneous factual finding, or whether any such error disturbs his conclusion regarding equitable estoppel. We have held

that Enterprise cannot prevail on its substantive theories of recovery: contract, state education law, or quantum meruit. Because Enterprise's arguments are meritless, it does not matter whether Enterprise is equitably estopped from making the arguments.

### B. 1987-88 and 1988-89 Academic Years.

The magistrate judge held that Enterprise should recover from Quitman for the years 1987-88 and 1988-89 under MISS. CODE ANN. § 37-19-27, which required the payment of funds for students transferred between districts in the same county. The magistrate judge found the amounts to be paid were $81.022.00 for 1987-88 and $124,574.91 for 1988-89. Quitman challenges the award, arguing that the Clarke County board did not consider on an individual basis the appeals of Quitman's denials of transfer requests, and that therefore the transfers from Stonewall to Enterprise were illegal.

In 1987-88 and 1988-89, Enterprise refused requests for transfer by Stonewall students who made a joint appeal for transfer to the Clarke County Board. The joint appeal did not contain any explanation for the transfers of any individual student.

The statute governing transfer payments during the 1987-88 and 1988-89 academic years was MISS. CODE ANN. § 37-19-27. In 1987, the Mississippi legislature expanded the coverage of § 37-13-27 from intercounty transfers to interdistrict transfers. 1986 Miss. Laws 1986, ch. 492, § 104 (effective July 1, 1987). Also, § 37-19-27 was amended to require payments to be made only for "legally"

61

transferred" students.  The transfers from Stonewall to Enterprise were interdistrict transfers.  Therefore, § 37-19-27 applies. Under § 37-19-27, Enterprise is liable for payments only if the transfers were valid.

To determine whether the Stonewall students were legally transferred, we turn to § 37-15-31, which sets out the procedure for interdistrict transfers.  Section 37-15-31 provided that if either the transferring or the receiving school board refuses a student's request for transfer,

> then an appeal may be had to [the] county board of education.  The said county board of education to which said appeal is taken shall act thereon not later than the date of its next regular meeting subsequent to the disapproval or failure to act by the school board by the school board of said school district, or not later than the date of its next regular meeting subsequent to the filing of such appeal.

MISS. CODE ANN. 37-15-31.  Section 37-15-31 did not require the county school board to consider of transfers "on an individual basis."  We therefore conclude that the actions of the Clarke County board, and the subsequent transfer of the Stonewall students, were legal.

Quitman argues that the Stonewall transfers violated Section 37-15-15.  Section 37-15-15, which governs intradistrict assignments, requires school boards to assign students within a particular district "on an individual basis."  It reads in full:

> In making assignments of children to schools or attendance centers, the school board shall take into consideration the educational needs and welfare of the child involved, the welfare and best interest of all the pupils attending the school or schools involved, the availability of school facilities, sanitary conditions and facilities at the school or schools involved, health

62

and moral factors at the school or schools, and in the community involved, and all other factors which the school board may consider pertinent, relevant or material in their effect on the welfare and best interest of the school district and the particular school or schools involved. All such assignments shall be on an individual basis as to the particular child involved and, in making such assignment, the school board shall not be limited or circumscribed by the boundaries of any attendance areas which may have been established by such board.

MISS CODE ANN. § 37-15-15. Section 37-15-15 is not applicable to interdistrict transfers. See Hinze v. Winston County Bd. of Educ., 103 So. 2d 353, 356 (Miss. 1958) (holding that the predecessor to § 37-15-15 does not apply to interdistrict transfers).

C.  1989-90 Through 1991-92.

The magistrate judge held that Enterprise should not recover for 1989-90 or any subsequent school years because Enterprise and Quitman did not enter into a contract for the payment of transfer funds as required by state law. In 1989, section 37-19-27 was amended to require boards approving transfers to enter into contracts "for the payment or nonpayment of any portion of their local maintenance funds which they deem fair and equitable in support of any transferred students." Absent such a contract, no such payments can be made. The magistrate judge stated:

> [T]his Court is of the opinion that, after 1989, the applicable Mississippi Code provisions required the parties to memorialize their transfer agreements. This Court further finds that Enterprise and Quitman failed to comply with this code provision, and as a result neither party was obligated to pay transfer funds to the other for the years following 1989.

Enterprise urges us to reverse the magistrate judge with respect to years 1989-90 through 1991-92. Enterprise's only

63

affirmative theory of relief for these years would be quantum meruit. As is discussed above, Enterprise did not have a reasonable expectation of payment and therefore is not entitled to recovery.

The magistrate judge required Quitman to make reasonable payments to Enterprise for court-ordered transfers in the school years 1992-93, 1993-94, and 1994-95. Quitman does not appeal this aspect of the district court's decision.

## IX. Conclusion.

We REVERSE the magistrate judge's order transferring students from northeastern Clarke County to Clarkdale and from Stonewall to Quitman. We AFFIRM all other aspects of the judgment. We REMAND for further appropriate proceedings.[42]

---

[42] In light of the resumption of school in the subject districts in the late summer of 1994, we direct that the mandate shall issue forthwith. See FED. R. APP. P. 41(a).